# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **GAIL WHITMIRE ROBERTS,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:12-CV-00842** |
| | § | |
| **CAROLYN W. COLVIN,**[1] | § | |
| Acting Commissioner of Social | § | |
| Security Administration, | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of a denial of Social Security benefits, Plaintiff Gail Whitmire Roberts ("Roberts") filed a Motion for Summary Judgment and Brief in support.[2] Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, filed his own Motion for Summary Judgment and Response to Roberts' Motion for Summary Judgment. This case has been transferred to this Court pursuant to 28 U.S.C. Section 636(c). Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **denies** Roberts' Motion for Summary Judgment and **grants** the Commissioner's Motion for Summary Judgment.

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. *See* FED.R.CIV.P. 25(d).

[2] Dkt. 10.

## I.   BACKGROUND

Roberts, born in 1961, suffers from diabetes, high blood pressure, migraines, dizziness, and neuropathy.  Roberts graduated from high school and completed one year of college.  (Tr. 361).  Roberts alleges she became disabled on October 7, 2007. (Tr. 30, 324, 328).  Prior to the onset of her alleged disability, she was employed as a retail sales manager.  (Tr. 354).

*Medical Records*

In 2005, Roberts began a regular series of appointments with Dr. Susie Nguyen, an internal medicine physician. (Tr. 672).  As Roberts' primary care provider, Dr. Nguyen has treated her for minor illnesses, such as influenza, as well as her chronic conditions—diabetes, headaches, and pain.

Dr. Nguyen first treated Roberts for migraines in May 2005.  Roberts' reported to Dr. Nguyen that her headache lasted one week.  (Tr. 663, 665).  Dr. Nguyen prescribed Fiorinal with codeine, a migraine medication, and she also instructed Roberts to continue taking Vicodin as needed.  Roberts then went six months without reporting a headache. In October of 2005, she complained of another severe headache.  (Tr. 661).  Dr. Nguyen prescribed Relpax (a migraine medication), Lortab (a narcotic pain medication), and Phenergan for nausea. *Id.*  On November 2, 2005, Roberts suffered another headache. Despite the numerous medications Roberts had previously been prescribed, Dr. Nguyen instructed her to continue taking Lortab and to start taking Soma, a muscle relaxer.  (Tr. 659).  One week later, on November 9, 2005, Roberts complained of another severe headache.  Dr. Nguyen ordered an MRI of Roberts' brain, with and without contrast.  (Tr.

657).   The MRI report stated that no abnormalities were detected—all findings were "normal." (Tr. 557-599).  Dr. Nguyen instructed Roberts to continue taking the muscle relaxers and narcotic pain medication and to start taking Topamax, a different migraine medication.  (Tr. 657).

On January 3, 2006, Roberts reported to Dr. Nguyen that she was still having headaches, and her headache severity was a five out of ten. (Tr. 651).  Dr. Nguyen then referred Roberts to Dr. Allen Chu, a board certified neurologist.  On January 6, 2006, Dr. Chu's tested Roberts and found no evidence of neurophysiologic abnormalities.   (Tr. 647).  Although Dr. Chu agreed to accept Roberts as a patient and treat her headaches, the medical record indicates only one visit with Dr. Chu.  *Id.*  Instead of seeing Dr. Chu, however, Roberts saw Dr. Nguyen for her headaches a few weeks later.  On January 31, 2006, Roberts reported to Dr. Nguyen that her headaches were "somewhat better, but still occurring daily." (Tr. 645).  Dr. Nguyen instructed her to continue taking Lortab, the narcotic pain medication. *Id.*

In March 2006, Roberts attended another follow-up appointment with Dr. Nguyen. At this appointment, Roberts reported still having intermittent headaches, but stated that she was "bothered mostly by pain in [her] cervical neck radiating into her shoulders." (Tr. 642).   Dr. Nguyen increased her Lortab to every six hours for ten days—she provided Roberts three refills.  (Tr. 643).

In August 2006, Roberts saw Dr. Nguyen again and reported that her headaches had increased in severity.  (Tr. 636-656).   Roberts also reported difficulty sleeping and "feeling depressed." (Tr. 639).  Dr. Nguyen gave Roberts an additional two refills of

Lortab, three muscle relaxant refills, and again prescribed Topamax. *Id.* In October 2006, Roberts told Dr. Nguyen that her headaches were continuing—Dr. Nguyen advised her to keep taking her medications. At Roberts' November appointment, Dr. Nguyen noted Roberts' depression was both "stable" and "better." (Tr. 635). Roberts told Dr. Nguyen that she was still having headaches three to four times per week—she was again directed to continue taking her medication. (Tr. 636). Roberts also saw Dr. Nguyen again in February and May of 2007. In February, Dr. Nguyen documented that Roberts reported she was "under tremendous stress" and had daily migraines. Roberts reported that on most days she took three Lortab tablets per day. (Tr. 630). At the May appointment, Roberts complained that the Topamax caused black-outs and memory deficits. Roberts reported continuing headaches despite the medications—she told Dr. Nguyen she was taking Lortab two to three times daily, four to five times per week. (Tr. 629). She also told Dr. Nguyen that she could not afford to take Lipitor for cholesterol. *Id.*

During her October 9, 2007 appointment with Dr. Nguyen, Roberts again complained of medication side effects, continued headaches, and neck and back pain. (Tr. 626). Roberts told Dr. Nguyen she had been working for the past one-and-a- half months at a retail store and that she experienced low blood sugar when working extended hours. Roberts received new prescriptions for headaches and muscle pain (Lortab and Flexeril) and was instructed to continue her medication for diabetes. *Id.* She was started on Crestor for high cholesterol. *Id.* Dr. Nguyen also reviewed stress relief techniques with Roberts. *Id.*

On October 29, 2007, Roberts again saw Dr. Nguyen with complaints of neck pain and headaches. (Tr. 623-24.)  She reported being in a motor vehicle accident the previous week.  According to Roberts, her neck pain and headaches increased after the accident. *Id.*  Her neck felt "very stiff" and was difficult to move. *Id.* Although no head trauma was observed, Roberts reported she may have blacked out.  *Id.*  Her physical examination by Dr. Nguyen was unremarkable, with the exception of minor range of motion deficits in her neck.  *Id.*  Dr. Nguyen instructed Roberts to stop taking the muscle relaxer, Flexeril and to instead start taking Robaxin for her muscle spasms, and to move her neck as much as possible.  She advised Roberts to continue taking Lortab for her headaches, as well as her other medications for diabetes and hypertension, and to follow-up in three months.  *Id.*

Roberts saw Dr. Nguyen eleven times in 2008, complaining primarily of headaches and chest pain. (Tr. 597-622). In February 2008, Roberts reported that her headaches were more severe, that she had difficulty sleeping, and that she had been taking Lortab two to three times per day. (Tr. 621-22).  Roberts' blood pressure at that visit was only slightly elevated and her physical examination was unremarkable. *Id.*  Dr. Nguyen again referred Roberts to Dr. Chu for a neurology consultation—however, Roberts told Dr. Nguyen that she could not afford to see a neurologist, and she did not make an appointment. *Id.*

Roberts saw Dr. Nguyen several times in April 2008.  (Tr. 610-617).  At each appointment she complained of stiffness and headache. Roberts reported taking the Lortab every six hours and Soma at least once per day.  Dr. Nguyen modified Roberts'

5

medication regiment for hypertension, hyperlipidemia, and headaches. *Id.* Dr. Nguyen also prescribed additional medication to attempt to better control Roberts' diabetes and refilled her prescriptions for Lortab and Soma. *Id.*

In April 2008, Dr. Nguyen ordered diagnostic testing for Roberts' chest pain. The CT scan showed no evidence of aortic dissection and no problems with her lungs. (Tr. 612). Dr. Nguyen increased Roberts' hypertension medication. (Tr. 614). On April 21, 2008, Dr. Nguyen wrote that Roberts' headaches were "more severe lately" and "possibly secondary to stress." (Tr. 614-15). Dr. Nguyen advised Roberts to continue taking her prescribed pain medication, but to limit the amount to six pills daily. *Id.* Roberts received a refill for her Lortab and Soma. Roberts returned for a follow-up in May of 2008, but did not complain of headaches or pain at that time. Roberts' medication regime was kept the same. (Tr. 608).

Dr. Nguyen saw Roberts again in August, September, November, and December of 2008. At each visit, Roberts reported headaches and the use of Lortab approximately four times per day. (Tr. 606). In November 2008, Roberts told Dr. Nguyen that she had not undergone the ordered blood work nor had she filled her prescriptions for her neuropathy medication and her diabetes medications. (Tr. 595-599). Roberts telephoned Dr. Nguyen's office on December 17, 2008, requesting samples of Lantus Insulin because she could not afford to fill the prescription. (Tr. 598). She also requested a Lortab refill. *Id.* Dr. Nguyen told Roberts she could have Lantus samples, however it was too soon to refill the Lortab. Roberts called back two days later and stated she

needed the Lortab refilled because she was going out of town. Dr. Nguyen refilled her Lortab at that time. (Tr. 597).

Two months after applying for Social Security benefits, in November 2008, Roberts attended a consultative examination with Dr. Syed Ahmed. (Tr. 437-43). Roberts reported severe leg tingling, decreasing vision, hypertension, feeling "off balance," and severe headaches three or four times a week. (Tr. 438). She also reported sharp neck pain two to three times per week. *Id.* No abnormalities were detected in her physical exam. *Id.* Roberts was able to walk normally, her heart sounds were good, and she seemed fully oriented and in "no acute distress." (Tr. 440). Based on this examination, Dr. Ahmed diagnosed Roberts with dizzy spells, history of migraine headaches, diabetes, and cervical radiculopathy. *Id.*

In December 2008, Roberts was seen at Memorial Hermann Katy Hospital Emergency Center with a dental abscess, chest pain, and back pain. (Tr. 676-737). Her physical examination, aside from the abscess, was normal. (Tr. 724). She had a normal chest x-ray and her ECG showed only a mild abnormality. (Tr. 725). She was treated for the abscess and was discharged the same day. (Tr. 726).

In 2009, Roberts saw Dr. Nguyen several times, again complaining of headache, leg cramps, and issues with her blood sugar. (Tr. 779-782, 589-596, 452-455). At each of these visits, Roberts told Dr. Nguyen that had not refilled her insulin and hypertension prescriptions as instructed. *Id.* Roberts stated that she sometimes went several weeks without taking her insulin and hypertension medications. *Id.* Dr. Nguyen repeatedly advised Roberts in January, July, and September 2009 to see a neurologist for her

7

headaches. *Id.* At each visit in 2009, Roberts' physical examination was always "unremarkably normal," with the exception of her blood pressure and blood sugar, which would otherwise have been controlled by the prescribed medication. (Tr. 779-782, 589-596, 452-455).

In April 2009, Roberts was seen by consultative psychologist, Dr. Glen McClure, for the purpose of evaluating her mental status for disability determination. (Tr. 12-13, 458-462). Her primary complaints to Dr. McClure were memory loss, blackouts, diabetes, migraines, high blood pressure, and memory loss. (458). When asked about her medical history, Roberts "denied any current or previous history of mental health treatment." (Tr. 459). She also denied any suicidal ideation. (Tr. 460). Dr. McClure noted that "there were no signs of a disability or impairment." He observed a lack of "pain posturing or postural shift during the evaluation." *Id.* Although Roberts self-reported a "sluggish mood," Dr. McClure described her behavior as "alert and responsive" during the interview. *Id.* He also noted that "Mrs. Roberts was pleasant and cooperative during the evaluation." (Tr. 461). Throughout the assessment, Dr. McClure saw "no evidence of acute distress or discomfort." (Tr. 460). Dr. McClure labeled Roberts' affect "euthymic." *Id.* Roberts told Dr. McClure that she had left her last job in January 2006 due to complications from her diabetes—she did not mention depression or headaches as contributing factors. (Tr. 458). Dr. McClure assigned Roberts a Global Assessment of Functioning (GAF) score of 65, noting "[her] ability to complete tasks timely and appropriately appears unimpaired by her alleged mental disorder." (Tr. 461).

Roberts continued to visit Dr. Nguyen during 2010. (Tr. 748-759). Dr. Nguyen repeatedly recommended that Roberts see a neurologist for her headaches. Roberts reported that her headaches were improving in February, March, June, and July 2010. In August 2010, Roberts was seen at the Memorial Herman Katy Hospital complaining of a headache and widespread body pain, as well as chest pain. (Tr. 677-710). A CT scan of Roberts' brain was normal and her chest x-ray was normal. (Tr. 710). Notably, a nurse recorded observing Roberts relaxing quietly and reading magazines until she was approached by the nurse, at which time she immediately began hyperventilating and complaining about pain. (Tr. 685-86). Similarly, at discharge, Roberts raised no complaints of pain until her family members asked that she receive a pain prescription, which she was given. (Tr. 686, 25.)

In October 2010, Roberts followed-up with Dr. Nguyen for the purpose of receiving medication refills. Roberts reported that, although her headaches were "better," they were still occurring three to four times per week. Dr. Nguyen noted that she "strongly advised [Roberts] to see [a] neurologist. [Roberts] states there is no way she can afford it at this time. Informed [Roberts], goal is to get her off of long term Lortab use." (Tr. 748). Dr. Nguyen stopped the prescription for Soma, noting that the "goal is to get [Roberts] off of addictive med[ication]." *Id.* At Roberts' November 2011 appointment, Roberts continued taking the Lortab, although Dr. Nguyen counseled her to use it "sparingly." (Tr. 746).

Roberts saw Dr. Nguyen five times in 2011, and she continued to report problems with headaches, blood sugar control, and stress. (Tr. 738-745, 784-793). With the

9

exception of the Lortab, Roberts continued to fail to comply with her medication regimen—often not filling her diabetes and blood pressure prescriptions on time and rationing her pre-meal insulin. (Tr. 738-745, 784-793). Roberts' symptoms of headache and pain were much worse when she did not use her insulin as directed. *Id.* In her charting notes, Dr. Nguyen suggested that Roberts' non-compliance was the reason her hypertension and diabetes were poorly controlled. *Id.*

On April 25, 2011, Dr. Nguyen completed a headache questionnaire that was later submitted by Roberts' attorney to the ALJ. In her answers, Dr. Nguyen stated that Roberts' headaches are treated with "analgesics (non-narcotics and narcotics)." (Tr. 791). Dr. Nguyen commented that the "response has been mild amelioration of pain. We have not been successful in aborting the headache." Responding to the question, "to what degree can your patient tolerate work stress?," Dr. Nguyen selected the following answer: "incapable of even 'low stress' jobs." Finally, when asked about "any other limitations," Dr. Nguyen answered that Roberts should "avoid triggers such as tension and stress." (Tr. 793). Dr. Nguyen also noted her continued recommendation that Roberts receive a complete neurological consultation and MRI of the brain. *Id.*

### *Application for Benefits*

On September 30, 2008, Roberts applied for social security disability insurance benefits ("SSDI") and supplemental security income benefits ("SSI"). (Tr. 324, 328). She stated that she was disabled as of October 2, 2007. *Id.* Roberts stated that her primary problems include chronic pain, diabetes, hypertension, and leg spasms (Tr. 353). She also reported dizziness and blackouts while driving. (Tr. 354.)

Roberts' application for benefits was initially denied on December 19, 2008 and denied upon reconsideration on May 7, 2009. (Tr. 131). Roberts filed a written request for a hearing before an Administrative Law Judge ("ALJ"), which was held on September 14, 2009. *Id.* ALJ Paul W. Schwartz issued a decision denying benefits on November 6, 2009. (Tr. 147). The Appeals Council then vacated the hearing decision and remanded the case for further proceedings. *Id.* The Appeals Council noted that:

> the hearing decision does not include an appropriate reverence to the standard for a finding of non-severe required by *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985). Further, the claimant's headaches were not found to be a severe impairment. . . . The Appeals Council finds that the claimant's headaches are a severe impairment under regulations and further development and evaluation is warranted.

The Appeals Council also noted that the ALJ failed to evaluate the effects of Roberts' obesity and failed to consider whether she has an underlying medical condition when assessing her credibility. (Tr. 148).

### *Hearing Before ALJ Paul W. Schwartz*

Roberts' second ALJ hearing occurred before ALJ Schwartz on July 27, 2011.[3] Roberts was represented by counsel. (Tr. 33). At the hearing, the ALJ heard testimony from Roberts, an impartial medical expert ("ME"), and from a vocational expert ("VE").

Roberts testified that she has not been able to work since 2007 because of leg pain, dizzy spells, migraines, and high blood sugar. (Tr. 38). She stated that her diabetes

---

[3] The hearing was initially set for April 4, 2011. However, Roberts' attorney requested a continuance, stating that "the claimant's actually present in the waiting area, and she's not feeling well. I'm told her blood sugar was "out of control today and she—neither she nor I feel that she can safely make it through a hearing without putting herself at risk." (Tr. 78-82).

causes "hot flashes, the cold—breaking out into cold sweats." She also said it makes her "hit the floor," or lose consciousness. (Tr. 41). She also complained that it caused numbness in her hands and legs. (Tr. 42). When asked how many headaches she has in a given month, Roberts reported "anywhere from eight to nine." (Tr. 43). She reported her pain level, even with medication, was at 8.5 out of 10. (Tr. 43-45). The ALJ asked Roberts if she "noticed a correlation between headaches and [her] blood sugar." (Tr. 45-46). Roberts testified that when her blood sugar is poorly controlled, her headaches increase. (Tr. 46).

The ME testified regarding Roberts' medical records and described her condition after her disability onset date of October 2, 2007. The ME testified that he had considered the totality of Roberts' medical records. He stated that Roberts had diabetes, but did not have "end-organ damage." (Tr. 57). Roberts also had hypertension, but "no evidence of cardiovascular complications." *Id.* He concluded that, although Roberts has diabetes, she did not meet the disability listing for diabetes. He further testified that she did not meet any of the cardiac listings. (Tr. 58). He noted that, although there is no listing for migraines, it is unlikely that Roberts' migraines are caused by her hypertension. (Tr. 61-62). He also noted that her tests do not reveal "any neurological deficits." (Tr. 59). He concluded that "based on the record I've reviewed, I feel she can function at a light RFC." (Tr. 58-59).

At the hearing, the VE testified that Roberts' past work as a retail store manager was "light skilled employment." (Tr. 71). The ALJ asked the VE whether a hypothetical person with Roberts' age and education, with the capacity to perform light work, could

perform Roberts' past relevant work.  (Tr. 71-72).  The VE testified that such a person would be able to perform Roberts' past work.  *Id.*  The ALJ then limited the hypothetical person to sedentary work and asked if there would be transferrable skills.  *Id.*  The VE testified that the skills would be transferrable to jobs in customer service, communication, sales, and record-keeping.  *Id.*  Roberts' attorney questioned the VE whether a person who was forced to miss three or more unscheduled days a month would change the results of the hypothetical.  The following exchange between Roberts' attorney and VE occurred:

> VE: If they're going to miss three or more days in a month, consistently, I'd typically with my—it would be my professional opinion that that will become problematic regarding the [inaudible] of employment.  In that past relevant work, I think it would be tolerated longer than it would for unskilled work, but certainly after nine months would likely result in termination.
>
> Q:  Okay.  If she were missing more than four times a month would it be—
>
> VE: Well, that—
>
> Q:  —an even shorter period?
>
> VE: No
>
> Q:  It would still, she still could hang in nine months possibly?
>
> A: Well, probably that would change to maybe six, again because it's a more professional administrative capacity there tends to be a greater tolerance, in my opinion, with that.

(Tr. 72-76.)

***The ALJ's Decision***

After this hearing, ALJ Schwartz issued a second decision that Roberts was not disabled and denied benefits on September 8, 2011. (Tr. 11). Based on the medical evidence and hearing testimony, the ALJ found that, although Roberts suffered from the "severe" impairments of degenerative disc disease, diabetes with neuropathy, hypertension, migraine headaches, and obesity, she did not have a listing-level of impairment. (Tr. 12). Further, he found that Roberts "has the residual functional capacity to perform light work, including her past work as a retail manager." (Tr. 11-18).

In making this determination, the ALJ found that Roberts' statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with his determination of her RFC. *Id.* Specifically, he noted, "there is evidence that [Roberts] has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as [she] has alleged in connection with this application." (Tr. 29). He also found "no objective evidence in the record to support the limitations set forth within Dr. Nguyen's opinion [in the headache questionnaire]." (Tr. 28). The ALJ did not find Roberts' "claims of headache pain to be so frequent or severe as to prevent substantial gainful activity, especial when the neurological examinations have been unremarkable." (Tr. 28). Furthermore, the ALJ noted, "Dr. Nguyen apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (Tr. 29). The ALJ found no evidence showing that Roberts could not perform her past work—he noted

Roberts "physical and neurological examinations were objectively unremarkable or normal." (Tr. 29-30).

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.,* 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to whether the decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must affirm the Commissioner's final decision when substantial evidence supports the Commissioner's decision and the Commissioner followed the relevant legal standards. *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Reversal is appropriate only if no credible evidentiary choices support the Commissioner's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Indeed, "[t]he court does not reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey*, 230 F.3d at 135.

The claimant bears the burden of proving his disability by establishing a physical or mental impairment lasting at least 12 months and preventing him from engaging in any substantial gainful activity. 42 U.S.C. §1382c. To determine whether a claimant is capable of engaging in any substantial gainful activity, the Commissioner applies a five-step sequential evaluation process. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. § 416.920(a)(4). A finding that a claimant is disabled at any point in the five-step process is conclusive and terminates the Commissioner's analysis. *Bowling*, 36 F.3d at 435. Although the burden of production shifts to the Commissioner at step five, the ultimate burden of persuasion remains with the claimant. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

## IV.   ANALYSIS

Roberts raises several points of error.  First, she contends the ALJ failed to give controlling weight to the opinion of her treating physician and failed to complete the required analysis before rejecting her treating physician's opinion.  Second, she contends the ALJ erred in finding her depression was not "severe."  Third, she complains the ALJ failed to obtain updated medical opinions from a medical expert and a psychologist regarding the cumulative effects of all of her severe and non-severe impairments.  Fourth, she contends the ALJ's RFC finding failed to consider her mental limitations and that the ALJ's hypothetical question to the VE failed to properly account for her mental limitations.   Fifth, Roberts contends the ALJ improperly relied on VE testimony regarding national and regional job numbers.  Finally, she claims the ALJ erred by not determining whether she could maintain employment.

### A. Statutory Basis for Benefits

Roberts applied for both Social Security disability insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability). In contrast, SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line. 20 C.F.R. § 416.110.  Eligibility for SSI is

based on proof of disability and indigence. *See* 42 U.S.C. § 1382c(a)(3) (definition of disability); 42 U.S.C. §§ 1382(a) (financial requirements). Although these are separate and distinct programs, applicants to both programs must prove "disability" under the Act. *See* 42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382(c)(3)(A) (SSI). The law and regulations governing the determination of disability are the same for both programs. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B. Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id.*; 42 U.S.C. § 1382c(a)(3)(B).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant

work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the claimant is determined to be disabled or not disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut this finding. *Id.*

### C. Opinions of Roberts' Treating Physician

Roberts first contends the ALJ erred by failing to give controlling weight to the opinions of her treating physician, Dr. Nguyen, that Roberts was "incapable of even 'low stress' jobs" and that Roberts was likely to be absent from work "more than four times a month." Roberts also contends that the ALJ failed to complete the required analysis under section 404.1527(d)(2) before rejecting these opinions. Finally, Roberts contends that the ALJ was required to request additional medical evidence before rejecting Dr. Nguyen's opinions.

Under the Social Security regulations, a treating physician's opinion on the nature and severity of a claimant's impairment should receive "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Perez v. Barnhart*, 415 F.3d 457, 465-66 (5th Cir. 2005); *Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993). On the other hand, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000). If there is no other reliable medical evidence from another treating or examining physician that controverts the treating physician's opinion, then the ALJ may reject the treating physician's opinion "*only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria in 20 C.F.R. § 404.1527(d)." *Newton*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original). Section 404.1527(d) requires an ALJ to evaluate the opinion in light of the following: "(1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which 'tend to support or contradict the opinion.'" 20 C.F.R. § 404.1527(d); s*ee also* 20 C.F.R. § 416.927(d); Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996); SSR 96–2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).

The ALJ first conducted a thorough analysis of Dr. Nguyen's treatment of Roberts, reviewing and summarizing the notes from each of Roberts' numerous visits with Dr. Nguyen from 2007 through 2011. (Tr. 28). The ALJ then addressed the particular opinions to which Roberts directs the Court—Dr. Nguyen's responses to a pre-printed "Residual Functional Questionnaire." The ALJ's opinion summarized Dr. Nguyen's answers to the Questionnaire, "Dr. Nguyen has essentially opined that the claimant would be incapable of work at any level." (Tr. 28).

The ALJ next noted that opinions of a treating physician should normally be entitled to controlling weight and proceeded to evaluate Dr. Nguyen's opinions under the criteria of section 404.1527(d). The ALJ observed that Dr. Nguyen had been treating Roberts "every three or four months since 2005." (*Id.*) However, the ALJ noted that Dr. Nguyen's specialty was Internal Medicine, that Dr. Nguyen had repeatedly recommended that Roberts see a neurologist for further treatment of her headaches, and that Dr. Nguyen's responses to the Questionnaire indicated that she herself believed Roberts should undergo a full neurological consultation and an MRI. The ALJ concluded that the objective evidence in the record did not support Roberts' allegations that her headaches were so severe as to prevent all employment. The ALJ noted that, "Dr. Nguyen apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (Tr. 29). Accordingly, he afforded her opinions "little weight." (Id.).

21

The ALJ did not err by failing to afford Dr. Nguyen's opinions from the Questionnaire controlling weight. This type of treating physician questionnaire has been described by the Fifth Circuit as "typify[ing] 'brief or conclusory' testimony." *Foster v. Astrue,* 410 FED. APP'X. 831, 833, 2011 WL 480036, 2 (5th Cir. Feb. 10, 2011). Further, the ALJ correctly noted that Dr. Nguyen's opinion that Roberts could not handle a "low stress" job and that she would miss at least four days of work were not in line with the objective medical evidence in the record. The ALJ conducted the very analysis under section 404.157(d)(2) that Roberts contends now was not performed.

Further, the ALJ did not err by not requesting additional evidence before rejecting Dr. Nguyen's opinions, as Roberts alleges was required by section 404.1512(e)(1). The Fifth Circuit has stated that, "if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Newton*, 209 F.3d at 453 (emphasis added). Here, the record contains ample "other medical opinion evidence based on personal examination or treatment of the claimant," such as laboratory tests, CT scans, x-rays and MRI results, notes from other treatment providers who personally examined Roberts, including Memorial Katy Hospital, Dr. Chu and Dr. Ahmed. Accordingly, the ALJ did not err by seeking clarification or additional evidence from Dr. Nguyen.

### D. Roberts' Depression

Roberts next contends that the ALJ erred by not finding her depression was "severe." An impairment is "severe" if it significantly limits an individual's physical or mental abilities to do basic work or activities; it is not "severe" if it "is a slight abnormality or combination of slight abnormalities that has no more than a minimal effect on the claimant's ability to do basic work activities." *Stone v. Heckler*, F.2d 1099, 1101 (5th Cir. 1985).

The ALJ's opinion reviewed Roberts' medical records, including her consultative examination by Dr. McClure and the Psychiatric Review conducted by Dr. Reddy (Tr. 12, 13). The ALJ also considered the four functional areas known as the "paragraph B criteria"—(1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C. The ALJ devoted a full paragraph in the opinion to each of the physicians' opinions, as well as each of these functional areas, addressing each in detail in light of the medical evidence in the record. (Tr. 13, 14).

Roberts did not list depression as an impairment in her disability application or supporting materials, (Tr. 324-363) nor did she include it among the reasons she left her job in 2006 when she was examined by Dr. McClure. (Tr. 457). Further, although Dr. Nguyen treated Roberts on a regular basis for a number of years, Dr. Nguyen never diagnosed Roberts with depression, nor did Dr. Nguyen ever refer Roberts for psychiatric counseling. (Tr. 636-656). Roberts' only diagnosis of depression is Dr. McClure's notation of "depressive disorder NOS," a conclusion that was made during his single

consultative exam and was based upon her self-reported symptoms. (Tr. 471). Further,
Dr. McClure noted that Roberts' depression did not meet the criteria for a major mood or
affective disorder. (Tr. 461). Similarly, there is no evidence in the record that Roberts
ever independently sought counseling or asked to be prescribed anti-depressants.

On the other hand, Roberts consistently appeared to be well-groomed during her
visits with various doctors, and she was described as "alert and responsive" during her
examination with Dr. McClure. (Tr. 459-60). Dr. McClure stated that Roberts'
prognosis was "good" and that "[i]t is likely she would respond favorably to mental
health treatment." (Tr. 461). Further, during her testimony before the ALJ, Roberts stated
that many of the symptoms she described to Dr. McClure are actually either side-effects
of the various medications she takes or are caused by her headaches. (Tr. 43, 44, 48).[4]

Notably, despite being examined at length by her attorney during two separate
hearings before the ALJ, Roberts never mentioned suffering from any specific symptoms
of depression or how they interfered with her ability to do basic work activities. Her
counsel asked whether she had ever been diagnosed with depression or anxiety and
Roberts testified, "No. But I'm sure I've had it." (Tr. 53, 54). When asked whether she
wanted to inform the ALJ of any other issues, Roberts simply answered, "No." (Tr. 56).

After reviewing all of the evidence, the ALJ found that Roberts had only mild
limitations in the areas of "daily living," "social functioning," and concentration." (Tr.
13-14). The ALJ incorporated Dr. McClure's assigned GAF score of 65, which indicated

---

[4] Roberts stated that her migraines caused her to be "groggy," "light-headed" and "dizzy" (Tr.
43, 44, 45) and that her medications made her "sleepy" (Tr. 44) and decreased her appetite (Tr.
48).

that Roberts may have some mild symptoms or some difficulty in social and occupational functioning, however the ALJ also noted that Roberts was "generally functioning pretty well, and has some meaningful relationships." (Tr. 12). The ALJ also incorporated Dr. McClure's notes that Roberts had "good" relationships and the "ability to complete tasks timely and appropriately appeared unimpaired by her alleged mental disorder." (Tr. 14). This evidence—in combination with the lack of any evidence showing that Roberts' alleged depression had "more than a minimal effect on [her] ability to do basic work activities"—adequately supported the ALJ's finding that Roberts' depression was not severe.

Roberts next contends that the ALJ erred by failing to order a more recent psychological consultative examination than the one in the record, which was performed by Dr. McClure in 2009. As the Fifth Circuit held in *Carey v. Apfel*, an ALJ "has a duty to fully and fairly develop the facts relative to a claim for disability benefits." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). An ALJ who fails to order a consultative examination commits reversible error "when such an evaluation is necessary for him to make an informed decision." *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (5th Cir. 1984). The ALJ decides whether such evaluation is necessary by examining the record, and the decision is committed to the ALJ's discretion. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989).

Here, the ALJ had ample medical evidence demonstrating that Roberts' depression was not severe–*i.e.*, that it had no more than a "minimal effect" on Roberts' "ability to work." At the 2011 hearing, Roberts' attorney did not elicit testimony from her to show

that her depression had worsened since her consultation with Dr. McClure in 2009. Similarly, none of Roberts' medical records from 2009 through 2011 indicate that her depressive symptoms increased during that time. Finally, Roberts' attorney never requested an updated consultative examination during either of the hearings before the ALJ. In short, there is nothing to indicate that an additional consultative examination was required to allow the ALJ to make an "informed decision" as to the severity of Roberts' depression during the relevant time period.

This Court will not reverse the decision of an ALJ for alleged failure to fully and fairly develop the record unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she "could and would have adduced evidence that might have altered the result." *Carey*, 230 F.3d at 142 (internal citations omitted); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) ("Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision."). Roberts has not demonstrated that she "could or would have adduced evidence" that would have changed the ALJ's determination. Her only argument is that "depression can be very easily spurred by situations like that which Plaintiff faces—being unemployed, and having debilitating medical conditions." (Plainitff's Motion for Summary Judgment, Dkt. 10). This argument simply does not carry her burden of establishing prejudice.

26

### E. Cumulative Effect of Roberts' Impairments

Roberts next contends the ALJ erred by failing to obtain an updated medical opinion as to the medical equivalence of her combined mental and physical impairments.

As noted above, the ALJ did not err by failing to order an updated consultative psychological evaluation. In the same vein, Roberts also argues that the ALJ should have obtained an updated medical opinion regarding the combination of all of her alleged impairments before finding that she did not have a listing-level impairment and that she was a capable of performing the full range of light work.

Roberts is correct in asserting that an ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity." *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); 20 C.F.R. § 404.1523. However, there is no evidence in the record indicating that the ALJ was required to obtain an additional medical opinion before making an "informed decision" regarding the cumulative effect of all of her impairments. Here, the record contained voluminous medical evidence up to the date of the 2011 hearing, and the ALJ considered all of this evidence when evaluating the effects of Roberts' impairments, singularly and in combination. Similarly, the ME who testified at the hearing based his conclusions regarding the cumulative effect of Roberts' impairments upon this updated evidence. (Tr. 58).

The Court has already found that the ALJ did not err by concluding that Roberts' depression was not severe.[5] Further, the ALJ properly considered the cumulative effect of all of Roberts' impairments, including her depression, and he was not required to order an updated consultative examination before finding that Roberts did not have a listing-level impairment and that she was capable of performing light work.

### F.  ALJ's  Hypothetical Question to VE

Next, Roberts contends that the ALJ posed a deficient hypothetical question to the VE, failing to take her "mental limitations" into account. As noted above, the record does not show that Roberts' alleged depression interfered with her ability to work. An ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE, if the ALJ did not find the alleged limitations to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988); *see also Gardner v. Massanari*, 264 F.3d 1140, 2001 WL 822457, *2 (5th Cir. June 18, 2001) ("The hypothetical question that an ALJ poses to a VE need only incorporate the disabilities that the ALJ recognizes.").

To the extent Roberts wished to challenge the ALJ's hypothetical question at the hearing, her counsel had an opportunity at the hearing to cross-examine the VE on this point but did not do so. *See Carey v. Apfel,* 230 F.3d 131, 146-47 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous

---

[5] Additionally, the Court notes that  Roberts' counsel had an opportunity to cross-examine the ME regarding the cumulative effect of her impairments and depression.  However, Roberts' counsel limited his questions to Roberts' headaches and symptoms of neuropathy. (Tr. 62-70).

provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.").

### G. VE's Testimony as to National and Regional Job Numbers

Roberts next challenges the ALJ's reliance on the VE's testimony regarding the number of jobs that Roberts could perform in the national economy. Roberts contends that the VE's testimony is unreliable because no source for these numbers exists.

At the outset, the Court notes that the ALJ first found that Roberts was capable of performing her past relevant work as a Retail Store Manager.[6] Other than the points discussed above, Roberts does not appear to challenge that finding. Accordingly, her complaint about the VE's testimony on the number of other jobs is moot. *See, e.g., Audler v. Astrue*, 501 F.3d 446, 447 (step four in ALJ's sequential analysis is whether "the impairment prevents the claimant from doing past relevant work," while step five is whether "the impairment prevents the claimant from doing any other substantial gainful activity," and the Commissioner has the burden at step five to show "that there is other substantial work in the national economy that the claimant can perform."); *Alexander v.*

---

[6] The ALJ then went on to make alternative findings that: (1) there were other jobs existing in the national economy that Roberts could perform; and (2) even assuming without finding that Roberts was limited to an RFC of sedentary work, she would still be able to obtain employment because she had acquired transferrable skills suitable for jobs that existed in significant numbers in the national economy. (Tr. 30) Roberts challenges the VE's testimony, contending that the VE improperly relied on the Dictionary of Occupational Titles because the DOT is "obsolete" and not reliable. However, the applicable regulations specifically list the DOT among the compendiums of "reliable job information available from various governmental and other publications" of which an ALJ may take administrative notice. *Id.*, § 416.966(d). Further, Roberts' counsel was given opportunity but wholly failed to question the VE about her expertise or reliance on these numbers at the hearing.

*Astrue* , 412 Fed. App'x. 719, 721, 2011 WL 573518, 2 (5th Cir. 2011) (finding at step four that claimant can perform past relevant work should result in conclusion that claimant is not disabled and ends analysis).

### H. ALJ's Step Five Determination

Finally, Roberts argues that the ALJ failed to make a determination that she could maintain employment.  Essentially, Roberts is arguing that her impairments "wax and wane" in severity, and the ALJ should have included a finding as to whether she could hold any of the listed jobs for a significant period of time.

When a claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms," an ALJ is required "to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (e.g., mental illness) nature of the claimant's alleged disability." *Frank v. Barnhart,* 326 F.3d 618, 619 (5th Cir. 2003).  "[T]o support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time."  *Id.*

However, the Fifth Circuit has "made it clear" that an ALJ is not required to "make a specific finding regarding the claimant's ability to maintain employment in every case."  *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) (even claimant's testimony that he had "good days and bad days" and that his pain medication eventually wore off did not trigger requirements for ALJ to make finding).  As the Northern District of Texas recently observed, "it is not enough for a claimant to assert, in general, that the impairment waxes and wanes; the claimant must demonstrate that his particular

30

impairment waxes and wanes." *Tigert v. Astrue*, 2012 WL 1889694, 7 (N.D. Tex. May 2, 2012) (Magistrate Judge J. Cureton) (adopted by Judge Means, May 24, 2012).   The ALJ found that Roberts' testimony about the severity of her symptoms and their level of interference with her ability work was not wholly credible.   Further, the RFC assigned in the ALJ's opinion took all of Roberts' physical impairments into account and limited her to only light work.   Without evidence in the record to show that her impairments somehow limit her to working only in short intervals, or that her impairments wax and wane in such a way as to wholly prevent employment, the ALJ's determination regarding Roberts' ability to maintain employment "is subsumed in the RFC definition."   *Perez*, 415 F.3d at 465; see also *Barratt v. Astrue*, No. 07-51067, 2008 WL 2325636 (5th Cir. Jun. 6, 2006).   Accordingly, the Court finds that the ALJ did not err by failing to make a finding as to Roberts' ability to maintain employment.

## Conclusion

A review of the record reveals that the ALJ applied the appropriate legal standards in making his determination.   Additionally, substantial evidence supports the ALJ's determination that Roberts is not disabled under the relevant provisions of the Social Security Act.   A review of the pleadings and the record on file reflect that there is no

genuine issue of material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56.  Accordingly, the Court **DENIES** Roberts' Motion for Summary Judgment and **GRANTS** the Commissioner's Motion for Summary Judgment.

SIGNED at Houston, Texas on May 24, 2013.

George C. Hanks, Jr.
United States Magistrate Judge